UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| HARVEY HORWITZ, Derivatively on Behalf of TENET HEALTHCARE CORPORATION, | ) ) ) | Case No. |
| | ) | |
| Plaintiff, | ) | VERIFIED STOCKHOLDER DERIVATIVE |
| v. | ) | COMPLAINT FOR BREACH OF FIDUCIARY |
| | ) | DUTY, WASTE OF CORPORATE ASSETS, |
| TREVOR FETTER, DANIEL J. | ) | AND UNJUST ENRICHMENT |
| CANCELMI, R. SCOTT RAMSEY, | ) | |
| EDWARD A. KANGAS, BRENDA J. | ) | |
| GAINES, KAREN M. GARRISON, J. | ) | |
| ROBERT KERREY, FREDA C. LEWIS- | ) | |
| HALL, RICHARD R. PETTINGILL, | ) | |
| RONALD A. RITTENMEYER, TAMMY | ) | |
| ROMO, JAMES A. UNRUH, BIGGS C. | ) | |
| PORTER, JOHN E. BUSH, and J. | ) | |
| MCDONALD WILLIAMS, | ) | |
| | ) | |
| Defendants, | ) | |
| -and- | ) | |
| | ) | |
| TENET HEALTHCARE CORPORATION, | ) | |
| a Nevada corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

## SUMMARY OF THE ACTION

1.      This is a stockholder derivative action on behalf of nominal defendant Tenet Healthcare Corporation ("Tenet" or the "Company") for breach of fiduciary duty, waste of corporate assets, and unjust enrichment.  Tenet, through its subsidiary, Tenet HealthSystem Medical, Inc. ("THSM"), operates general acute care hospitals, short-stay surgical hospitals, and outpatient centers throughout the United States.

2.      This action arises out of an illegal scheme orchestrated at Tenet that sought to take advantage of some of the most vulnerable members of society, pregnant undocumented immigrants, in order to reap an unjust and illegal profit.  Tenet hospitals operating in the greater Atlanta, Georgia, metropolitan area and in Spalding and Hilton Head, South Carolina, systematically paid healthcare kickbacks and bribes to Hispanic Medical Management d/b/a Clinica de la Mama ("Clinica").  In particular, Tenet entered into sham contracts for various services including translation, marketing, management, and Medicaid eligibility determination services with clinics run by Clinica that served Hispanic women.  Clinica then agreed to send its patients, mostly pregnant, undocumented Hispanic women, to Tenet facilities for medical services related to labor and delivery that were paid for by the Medicaid and Medicare programs.[1]  These undocumented immigrant patients were sent to Tenet hospitals even though often there were closer, and thus safer, alternative hospitals.

3.      The breadth of the scandal is staggering.  From 2000 to at least 2013, Tenet paid over $12 million to these clinics and over 20,000 referrals to its facilities were tainted by the bribery.  Notably, a whistleblower filed a *qui tam* action against the Company over its illegal

---

[1] Although undocumented pregnant women are not eligible for regular Medicaid coverage, they can qualify for emergency medical assistance ("EMA") when they deliver their babies.  Thus, Tenet charged the U.S. Government for the services it provided to these women.

conspiracy back in 2009. Despite the *qui tam* action and the government beginning its investigation at or around that time, the Company continued its illegal referral conspiracy for another four years.

4.     The Company netted $145 million from the referrals sent to it as a result of the illegal kickbacks. Tenet, however, will have to pay back all that money and more. On October 3, 2016, the U.S. Department of Justice ("DOJ") announced that two of the Company's subsidiaries operated by THSM will plead guilty to conspiracy and defrauding the government. THSM will enter into a non-prosecution agreement with the DOJ that will require it to cooperate with the government and enter into certain corporate governance reforms. Further the Company will need to pay certain fines and reimbursements beyond the $145 million mentioned above. In total, Tenet will be forced to pay over $513 million to resolve its federal False Claims Act (31 U.S.C. §3729, *et seq.*) and Anti-Kickback Statute (42 U.S.C. §1320a-7b) liability.

5.     Notably, this most recent settlement is not Tenet's first settlement with the government for violating the federal healthcare laws. In 2006, Tenet agreed to pay $900 million to resolve claims that the Company violated the False Claims Act with unlawful Medicare billing practices. As a part of the 2006 settlement, Tenet also agreed to a Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services' ("HHS") Office of the Inspector General to ensure that all Tenet facilities complied with Medicare and Medicaid program requirements, including compliance with the Anti-Kickback Statute. The Inspector General of HHS conditioned Tenet's participation in the Medicare and Medicaid programs on the Company's compliance with the CIA for five years. The CIA required, among other things, that Tenet strengthen its policies, procedures, and controls for contracts with referral sources to ensure compliance with the Anti-Kickback Statute. The CIA also required certain Tenet employees who

reviewed or approved contracts with referral sources, including Tenet hospital Chief Executive Officers ("CEOs") and Chief Financial Officers ("CFOs"), to attend specialized training on contracts with referral sources during each year of the CIA. Tenet's illegal referral fee conspiracy violated this CIA.

6.     The Company's stockholders were in the dark about the defendants' illegal scheme. While the above conspiracy was occurring, Tenet disguised the illegal kickbacks as legitimate expenses in the Company's financial statements and reports. Defendants claimed in Tenet's public statements, including the Company's Annual Reports on Forms 10-K for at least 2011, 2012, and 2013, that Tenet's financial results were true and correct, fairly stated the Company's financial condition, and that Tenet had effective internal controls for legal compliance when. None of these statements were true.

7.     Tenet has been severely damaged by the defendants' actions. In addition to the hundreds of millions of dollars the Company has had to pay the government, Tenet is now a defendant in at least two securities class actions. Despite this fact and the clear culpability, the Company's Board of Directors (the "Board") has not taken any legal action against the directors and officers responsible for this conspiracy. Nor will they. As this scheme unfolded, risking untold lives, the Individual Defendants made approximately $231.5 million in salaries, fees, stock, and other incentive-based compensation based, in least in part, on the unlawful revenues and profit received from this scheme.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive

action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) Tenet maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Tenet, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

11.    Plaintiff Harvey Horwitz was a stockholder of Tenet at the time of the wrongdoing complained of, has continuously been a stockholder of Tenet since 2010, and is a current Tenet stockholder.  Plaintiff is a citizen of New Mexico.

**Nominal Defendant**

12.    Nominal Defendant Tenet is a Nevada corporation with principal executive offices located at 1445 Ross Avenue, Suite 1400, Dallas, Texas.  Accordingly, Tenet is a citizen

of Nevada and Texas.   Tenet is a diversified healthcare services company which operates in regionally focused, integrated healthcare delivery networks in urban and suburban markets. Tenet's core business operations are acute care and specialty hospitals that provide a range of healthcare services.   The Company also provides revenue cycle management, technology-enabled performance improvement, and health management solutions to health systems, hospitals, private physicians, and self-insured organizations.   As of December 31, 2015, Tenet operated eighty-six hospitals, twenty short-stay surgical hospitals, over 475 outpatient centers, nine facilities in the United Kingdom and six health plans and employed approximately 134,630 people.

**Defendants**

13.    Defendant Trevor Fetter ("Fetter") is Tenet's CEO and a director and has been since September 2003; Chairman of the Board and has been since May 2015; and President and has been since November 2002.  Defendant Fetter was Tenet's Interim CFO from March 2012 to September 2012;  Chief Corporate Officer and CFO from January 1999 to February 2000; Executive Vice President and CFO from June 1996 to January 1999; and Executive Vice President from October 1995 to June 1996.   Tenet paid defendant Fetter the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| 2015 | $1,316,346 | - | $9,000,061 | - | $2,807,550 | $2,016,823 | $213,503 | $15,354,283 |
| 2014 | $1,250,000 | - | $8,000,000 | - | $3,857,428 | $4,612,782 | $229,897 | $17,950,107 |
| 2013 | $1,207,983 | - | $17,500,077 | $2,499,193 | $1,313,996 | - | $212,878 | $22,734,127 |
| 2012 | $1,103,447 | - | $2,599,000 | $2,613,260 | $1,615,627 | $3,107,174 | $201,895 | $11,240,403 |
| 2011 | $1,081,000 | - | $4,875,002 | - | $2,671,061 | $1,926,414 | $186,864 | $10,740,341 |
| 2010 | $1,081,000 | - | $3,648,993 | $1,214,546 | $4,581,616 | $1,490,408 | $226,383 | $12,242,946 |
| 2009 | $1,081,000 | - | - | $3,905,000 | $4,075,825 | $1,383,505 | $255,420 | $10,700,750 |
| 2008 | $1,081,000 | - | $2,089,620 | $4,050,810 | $2,288,750 | $1,402,826 | $231,066 | $11,144,072 |
| 2007 | $1,081,000 | - | $4,239,000 | $2,016,560 | $1,857,969 | $487,430 | $203,862 | $9,885,821 |
| 2006 | $1,081,000 | - | $3,575,916 | $3,047,957 | $1,051,340 | $389,894 | $276,596 | $9,422,703 |
| 2005 | $1,065,346 | $1,165,291 | $1,848,206 | $2,285,652 | - | - | $376,201 | $6,740,696 |
| 2004 | $1,090,384 | $864,749 | $1,128,281 | $2,604,798 | - | - | $1,711,873 | $7,400,085 |
| 2003 | $848,539 | $262,500 | $3,728,000 | $2,842,000 | - | - | $1,283,641 | $8,964,680 |
| 2002 Transition | $332,500 | - | - | $6,637,500 | - | - | - | $6,970,000 |
| 5/31/2000 | $489,583 | $879,531 | - | $1,408,500 | - | - | $88,300 | $2,865,914 |

Defendant Fetter is a citizen of Texas.

14.     Defendant Daniel J. Cancelmi ("Cancelmi") is Tenet's CFO and has been since September 2012. Defendant Cancelmi was also Tenet's Senior Vice President from April 2009 to September 2012; Principal Accounting Officer from April 2007 to September 2012; Controller from September 2004 to September 2012; Vice President from September 1999 to April 2009; and Assistant Controller from September 1999 to September 2004. Tenet paid defendant Cancelmi the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2015 | $636,231 | $2,200,005 | - | $950,484 | $824,015 | $25,956 | $4,636,691 |
| 2014 | $565,923 | $4,900,001 | - | $984,001 | $2,316,274 | $15,575 | $8,781,774 |
| 2013 | $484,865 | $1,700,000 | $249,914 | $277,494 | $366,203 | $29,405 | $3,107,881 |
| 2012 | $391,758 | $1,685,500 | $492,000 | $245,274 | $453,204 | $7,148 | $3,274,884 |

Defendant Cancelmi is a citizen of Texas.

15.     Defendant R. Scott Ramsey ("Ramsey") is Tenet's Vice President, Controller, and Principal Accounting Officer and has been since September 2012. Defendant Ramsey was Tenet's Senior Director of Corporate Accounting from 2005 to 2012. Defendant Ramsey is a citizen of Texas.

16.     Defendant Edward A. Kangas ("Kangas") is Tenet's Lead Independent Director and has been since May 2015, and a director and has been since April 2003. Defendant Kangas was Tenet's Chairman of the Board from July 2003 to May 2015. Defendant Kangas is a member of Tenet's Quality, Compliance and Ethics Committee and has been since at least March 2008. Defendant Kangas was also Chairman of Tenet's Audit Committee and a member of that committee in at least April 2004. Tenet paid defendant Kangas the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Option Grants | Total |
|---|---|---|---|---|
| 2015 | $321,500 | $225,014 | - | $546,514 |
| 2014 | $317,000 | $220,000 | - | $537,000 |
| 2013 | $331,750 | $220,000 | - | $551,750 |
| 2012 | $320,247 | $170,000 | - | $490,247 |
| 2011 | $295,000 | $145,000 | - | $440,000 |
| 2010 | $290,000 | $130,000 | - | $420,000 |
| 2009 | $274,000 | $130,000 | - | $404,000 |
| 2008 | $274,046 | $130,000 | - | $404,046 |
| 2007 | $260,300 | $130,000 | - | $390,300 |
| 2006 | $278,300 | $312,089 | - | $590,389 |
| 2005 | $245,000 | $129,996 | - | $374,996 |
| 2004 | $228,500 | $129,998 | - | $358,498 |
| 2003 | $188,107 | - | 54867 | $188,107 |

Defendant Kangas is a citizen of Connecticut.

17.     Defendant Brenda J. Gaines ("Gaines") is a Tenet director and has been since March 2005. Defendant Gaines is Chairwoman of Tenet's Audit Committee and a member of that committee and has been since at least March 2016. Defendant Gaines was also a member of Tenet's Audit Committee from at least April 2006 to at least September 2011, and a member of the Quality, Compliance and Ethics Committee from at least March 2012 to at least March 2015. Tenet paid defendant Gaines the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Option Grants | Total |
|---|---|---|---|---|
| 2015 | $321,500 | $225,014 | - | $546,514 |
| 2014 | $317,000 | $220,000 | - | $537,000 |
| 2013 | $331,750 | $220,000 | - | $551,750 |
| 2012 | $320,247 | $170,000 | - | $490,247 |
| 2011 | $295,000 | $145,000 | - | $440,000 |
| 2010 | $290,000 | $130,000 | - | $420,000 |
| 2009 | $274,000 | $130,000 | - | $404,000 |
| 2008 | $274,046 | $130,000 | - | $404,046 |
| 2007 | $260,300 | $130,000 | - | $390,300 |
| 2006 | $278,300 | $312,089 | - | $590,389 |
| 2005 | $245,000 | $129,996 | - | $374,996 |
| 2004 | $228,500 | $129,998 | - | $358,498 |
| 2003 | $188,107 | - | 54867 | $188,107 |

Defendant Gaines is a citizen of Georgia.

18.     Defendant Karen M. Garrison ("Garrison") is a Tenet director and has been since March 2005.  Defendant Garrison is a member of Tenet's Quality, Compliance and Ethics Committee and has been since at least March 2016.  Defendant Garrison was also a member of Tenet's Audit Committee from at least September 2011 to at least March 2015, and a member of the Quality, Compliance and Ethics Committee from at least April 2006 to at least March 2010. Tenet paid defendant Garrison the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $142,500 | $175,015 | $317,515 |
| 2014 | $144,000 | $170,000 | $314,000 |
| 2013 | $151,750 | $170,000 | $321,750 |
| 2012 | $158,875 | $170,000 | $328,875 |
| 2011 | $134,000 | $145,000 | $279,000 |
| 2010 | $123,000 | $130,000 | $253,000 |
| 2009 | $109,000 | $130,000 | $239,000 |
| 2008 | $111,046 | $130,000 | $241,046 |
| 2007 | $91,700 | $130,000 | $221,700 |
| 2006 | $97,700 | $427,646 | $525,346 |
| 2005 | $96,500 | $273,306 | $369,806 |

Defendant Garrison is a citizen of Connecticut and Florida.

19.     Defendant J. Robert Kerrey ("Kerrey") is a Tenet director and has been since November 2012.  Defendant Kerrey was also a Tenet director from March 2001 to March 2012. Defendant Kerrey is a member of Tenet's Quality, Compliance and Ethics Committee and has been since at least March 2016.   Defendant Kerrey was also a member of Tenet's Audit Committee from at least March 2013 to at least March 2015, and a member of the Quality, Compliance and Ethics Committee from at least August 2001 to at least September 2011.  Tenet paid defendant Kerrey the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Option Grants | Total |
|---|---|---|---|---|
| 2015 | $129,500 | $175,015 | - | $304,515 |
| 2014 | $135,000 | $170,000 | - | $305,000 |
| 2013 | $146,000 | $170,000 | - | $316,000 |
| 2012 | $46,094 | $75,730 | - | $121,824 |
| 2011 | $138,000 | $145,000 | - | $283,000 |
| 2010 | $133,000 | $130,000 | - | $263,000 |
| 2009 | $121,000 | $130,000 | - | $251,000 |
| 2008 | $107,046 | $130,000 | - | $237,046 |
| 2007 | $101,600 | $130,000 | - | $231,600 |
| 2006 | $108,500 | $312,089 | - | $420,589 |
| 2005 | $108,500 | $129,996 | - | $238,496 |
| 2004 | $110,300 | $129,998 | - | $240,298 |
| 2003 | $110,300 | - | 18867 | $110,300 |
| 2002 Transition | $81,200 | - | 18000 | $81,200 |
| 5/31/2002 | $79,700 | - | 18000 | $79,700 |
| 5/31/2001 | $20,900 | - | - | $20,900 |

Defendant Kerrey is a citizen of New York.

20.     Defendant Freda C. Lewis-Hall ("Lewis-Hall") is a Tenet director and has been since December 2014.  Defendant Lewis-Hall is a member of Tenet's Quality, Compliance and Ethics Committee and has been since at least March 2015.  Tenet paid defendant Lewis-Hall the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $131,000 | $175,015 | $306,015 |
| 2014 | $7,228 | $136,764 | $143,992 |

Defendant Lewis-Hall is a citizen of New Jersey.

21.     Defendant Richard R. Pettingill ("Pettingill") is a Tenet director and has been since March 2004.  Defendant Pettingill is Chairman of Tenet's Quality, Compliance and Ethics Committee and has been since at least March 2013, and a member of that committee and has been since at least April 2005.  Tenet paid defendant Pettingill the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Option Grants | Total |
|---|---|---|---|---|
| 2015 | $156,500 | $175,015 | - | $331,515 |
| 2014 | $146,000 | $170,000 | - | $316,000 |
| 2013 | $162,250 | $170,000 | - | $332,250 |
| 2012 | $163,743 | $170,000 | - | $333,743 |
| 2011 | $150,000 | $145,000 | - | $295,000 |
| 2010 | $142,000 | $130,000 | - | $272,000 |
| 2009 | $109,000 | $130,000 | - | $239,000 |
| 2008 | $103,046 | $130,000 | - | $233,046 |
| 2007 | $90,500 | $130,000 | - | $220,500 |
| 2006 | $97,400 | $312,089 | - | $409,489 |
| 2005 | $95,000 | $129,996 | - | $224,996 |
| 2004 | $98,300 | - | 49905 | $98,300 |

Defendant Pettingill is a citizen of California.

22.     Defendant Ronald A. Rittenmeyer ("Rittenmeyer") is a Tenet director and has been since June 2010.  Defendant Rittenmeyer is a member of Tenet's Audit Committee and has been since at least September 2011.   Tenet paid defendant Rittenmeyer the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $166,500 | $175,015 | $341,515 |
| 2014 | $158,000 | $170,000 | $328,000 |

| | | | |
|---|---|---|---|
| 2013 | $168,250 | $170,000 | $338,250 |
| 2012 | $171,457 | $170,000 | $341,457 |
| 2011 | $144,000 | $145,000 | $289,000 |
| 2010 | $66,938 | $184,168 | $251,106 |

Defendant Rittenmeyer is a citizen of Texas.

23.    Defendant Tammy Romo ("Romo") is a Tenet director and has been since March 2015.  Defendant Romo is a member of Tenet's Audit Committee and has been since March 2015.  Tenet paid defendant Romo the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2015 | $103,264 | $266,148 | $369,412 |

Defendant Romo is a citizen of Texas

24.    Defendant James A. Unruh ("Unruh") is a Tenet director and has been since June 2004.  Defendant Unruh is a member of Tenet's Audit Committee and has been since at least April 2005.  Defendant Unruh was the Chairman of Tenet's Audit Committee from at least April 2005 to at least March 2015.   Tenet paid defendant Unruh the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Option Grants | Total |
|---|---|---|---|---|
| 2015 | $167,000 | $175,015 | - | $342,015 |
| 2014 | $162,000 | $170,000 | - | $332,000 |
| 2013 | $166,250 | $170,000 | - | $336,250 |
| 2012 | $179,743 | $170,000 | - | $349,743 |
| 2011 | $158,000 | $145,000 | - | $303,000 |
| 2010 | $151,000 | $130,000 | - | $281,000 |
| 2009 | $143,000 | $130,000 | - | $273,000 |
| 2008 | $126,246 | $130,000 | - | $256,246 |
| 2007 | $116,800 | $130,000 | - | $246,800 |
| 2006 | $129,222 | $312,089 | - | $441,311 |
| 2005 | $119,900 | $129,996 | - | $249,896 |
| 2004 | $121,100 | - | 41139 | $121,100 |

Defendant Unruh is a citizen of Arizona.

25.     Defendant Biggs C. Porter ("Porter") was Tenet's CFO from June 2006 to March 2012.   Tenet paid defendant Porter the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------------------------------------------------------|------------------------|-------|
| 2012 | $167,019 | - | $678,000 | $675,740 | - | - | $12,255 | $1,533,014 |
| 2011 | $579,000 | - | $1,312,504 | - | $745,590 | $501,086 | $39,151 | $3,177,331 |
| 2010 | $576,904 | - | $982,419 | $326,992 | $1,132,994 | $384,612 | $29,595 | $3,433,516 |
| 2009 | $568,100 | - | - | $781,000 | $1,215,999 | $348,859 | $31,398 | $2,945,356 |
| 2008 | $568,100 | $100,000 | $365,560 | $656,100 | $763,548 | $268,521 | $37,572 | $2,759,401 |
| 2007 | $554,177 | $100,000 | $683,250 | $277,000 | $533,730 | $178,446 | $41,661 | $2,368,264 |
| 2006 | $306,731 | $100,000 | $523,584 | $98,397 | $210,000 | - | $217,373 | $1,456,085 |

Defendant Porter is a citizen of Texas.

26.     Defendant John E. Bush ("Bush") was a Tenet director from April 2007 to December 2014.   Defendant Bush was a member of Tenet's Quality, Compliance and Ethics Committee from at least March 2008 to at least March 2014.   Tenet paid defendant Bush the following compensation as a director:

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|------------------------------|--------------|------------------------|-------|
| 2014 | $118,000 | $170,000 | - | $288,000 |
| 2013 | $128,500 | $170,000 | - | $298,500 |
| 2012 | $134,743 | $170,000 | - | $304,743 |
| 2011 | $126,000 | $145,000 | - | $271,000 |
| 2010 | $111,000 | $130,000 | $35,000 | $276,000 |
| 2009 | $115,000 | $130,000 | - | $245,000 |
| 2008 | $111,046 | $130,000 | - | $241,046 |
| 2007 | $61,581 | $390,000 | - | $451,581 |

Defendant Bush is a citizen of Florida.

27.     Defendant J. McDonald Williams ("Williams") was a Tenet director from March 2005 to May 2010.   Defendant Williams was a member of Tenet's Audit committee from at least April 2006 to at least March 2010.   Tenet paid defendant Williams the following compensation as a director:

- 12 -

| Fiscal Year | Fees Earned and Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $35,961 | - | $35,961 |
| 2009 | $127,000 | $130,000 | $257,000 |
| 2008 | $108,246 | $130,000 | $238,246 |
| 2007 | $95,600 | $130,000 | $225,600 |
| 2006 | $113,300 | $427,646 | $540,946 |
| 2005 | $106,400 | $273,306 | $379,706 |

Defendant Williams is a citizen of Florida.

28.     The defendants identified in ¶¶13-27 are referred to herein as the "Individual Defendants."

29.     As corporate fiduciaries, the Individual Defendants owed Tenet and its stockholders a fiduciary duty of loyalty to direct the operations of the Company's hospitals in conformity with the laws, rules, and regulations applicable to Tenet's business, including the federal False Claims Act, the Anti-Kickback Statute, and the CIA.  Despite this affirmative duty of legal compliance, Tenet adopted billing and contract review practices, procedures, and controls, and/or deployed such practices, procedures, and controls, in a manner that enabled Tenet hospitals in Georgia and South Carolina to pay kickbacks to the operators of prenatal care clinics in exchange for patient referrals while the Company was under defendants' direct supervision and oversight as Tenet directors and/or executive officers.  Although the kickback scheme enabled Tenet to obtain more than $145 million in federal healthcare funds, it ultimately exposed the Company to more than $513 million in liability for violating the federal False Claims Act and the Anti-Kickback Statute.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

30.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Tenet and its stockholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tenet in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Tenet and not in furtherance of their personal interest or benefit.

31.     To discharge their duties, the officers and directors of Tenet were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Tenet were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)     remain informed as to how Tenet conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, including potential violations of the False Claims Act, Anti-Kickback Statute, and the CIA, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

32.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, and a reckless disregard for their duties to Tenet that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

33.     The Individual Defendants breached their duty of loyalty and good faith by

allowing defendants to cause, or by themselves causing, the Company to engage in the illegal kickback/referral conspiracy for years despite numerous red flags, including the *qui tam* action and the CIA.

34.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Tenet, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Tenet has expended, and will continue to expend, significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to or permitted others to: (i) deceive the investing public, including stockholders of Tenet, regarding the Individual Defendants' management of Tenet operations; (ii) engage in an illegal kickback/referral conspiracy; and (iii) enhance the Individual Defendants' executive and directorial positions at Tenet and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

37.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty, waste of corporate assets, and unjust enrichment and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

38.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements and engage in the illegal kickback/referral conspiracy.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

39.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND: RELEVANT FEDERAL LAWS AND PROGRAMS

40.     Medicaid and Medicare are governmental programs managed by a division HHS that provides medical and health-related services to patients in the United States.

41.     Medicaid is a joint federal-state program that provides health and medical services for certain individuals and families with low incomes and few resources.  The Centers for Medicare and Medicaid Services provides primary oversight for Medicaid programs, while

- 16 -

each state is responsible for administering, setting eligibility standards, and determining the extent and nature of its services for its own Medicaid program.  Although participation in the program is voluntary, all states have participated in Medicaid since 1982.

42.     Medicare is a federal health insurance program that pays for hospital and medical care for elderly and certain disabled Americans.  Medicare coverage includes, among other things, inpatient and outpatient care, medical equipment, and prescription drug plans.  Eligibility for Medicare coverage is limited to patients aged sixty-five years and older, under sixty-five and disabled, or any age with End-Stage Renal Disease (permanent kidney failure that requires dialysis or a transplant).

43.     The Anti-Kickback Statute makes it unlawful to knowingly offer or pay any remuneration in exchange for the referral of any service for which payment is sought from any federally-funded healthcare program, such as Medicare or Medicaid.  This law prohibits healthcare providers from compensating, in cash or in kind, another healthcare provider when the purpose of the payment is to influence that provider's referral habits.  Every federally-funded health care program requires every provider to ensure compliance with the Anti-Kickback Statute.

44.     A violation of the Anti-Kickback Statute is punishable by disgorgement of ill-gotten proceeds, civil monetary penalties, and/or exclusion from participation in federal health care programs.  Any combination of the above-mentioned penalties would be catastrophic for Tenet.  In particular, loss of eligibility under Medicaid and Medicare would cripple its main source of revenue as the Company relies heavily on Medicaid and Medicare reimbursement for its profitability, as detailed above.

45.     The Company is also subject to the False Claims Act.  The FCA and similar state

provisions proscribe ***knowingly presenting or causing to be presented*** to the government any false of fraudulent claim for payment.  "Knowingly" includes making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the government.  "Claim" includes any request or demand, whether under contract or otherwise, for money or property which is made to a contractor grantee or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.  The government may recover treble damages for a violation of the False Claims Act and civil monetary penalties of up to $11,000 for each false claim.

## TENET'S 2006 SETTLEMENT AND CIA

46.     In June 2006, Tenet reached an agreement with the DOJ to end an investigation into its billing practices.  Specifically, the federal government had alleged that Tenet submitted claims for payment to Medicare using codes that it could not support or were improperly assigned to patient records in order to increase reimbursement to Tenet's hospitals.  In addition, Tenet inflated its charges substantially in excess of any increase in costs associated with patient care, which resulted in improper outlier payments.  Finally, Tenet gave illegal kickbacks to doctors to refer Medicare patients to its hospitals.

47.     The $900 million settlement was a major financial burden for the Company.  It represented approximately one-fourth of Tenet's market capitalization.  The Company had to sell approximately twelve hospitals in order to regain its financial footing.

48.     On September 28, 2006, the HHS Office of Inspector General announced that it entered into a CIA with Tenet over these same allegations.  The Inspector General called the

provisions in the CIA "Unprecedented" and that they "include Board of Directors Review."  The CIA covered Tenet, its wholly-owned subsidiaries and affiliates, and all hospitals and other health care facilities managed or controlled by Tenet.  The CIA required Tenet to submit annual reports to the Inspector General, which had to include certifications from the Company's officers that Tenet was in compliance with the requirements of the federal health care programs.  The officers had to certify "[t]o the best of my knowledge, except as otherwise described in the applicable report, Tenet is in compliance with the requirements of the Federal healthcare program requirements and the obligations of this CIA."

49.     The CIA specifically discusses the responsibilities of the Board's Quality, Compliance and Ethics Committee.  In particular, the CIA says the Quality, Compliance and Ethics Committee is responsible for the review and oversight of matters related to the compliance with the requirements of federal health care programs and the obligations of the CIA.  The Quality, Compliance and Ethics Committee was required to meet at least quarterly to review and oversee the performance of the Company's Chief Compliance Officer, Regional and Health Compliance Officers, the Ethics and Compliance Department, the Clinical Quality Department, the Corporate Compliance Committee, and Regional and Hospital Compliance Committees.  The Quality, Compliance and Ethics Committee also had to arrange for the performance review of the effectiveness of Tenet's compliance program, review the results of this review, and submit an annual report of the review to the Office of the Inspector General.  To ensure the Board members were individually responsible for Tenet's compliance with federal rules, the Quality, Compliance and Ethics Committee was required to adopt a resolution, signed by each individual member of the committee, summarizing its review and oversight of Tenet's

compliance with the federal health care program and the obligations of the CIA.[2]

## THE ILLEGAL KICKBACK/REFERRAL CONSPIRACY

50.     As a recipient of Medicaid and Medicare program funds, the Company and its hospitals are subject to the False Claims Act and the Anti-Kickback Statute.  As Tenet admits, until at  least 2013, Tenet hospitals operating in the greater Atlanta, Georgia, metropolitan area and in Spalding and  Hilton Head, South Carolina, paid healthcare kickbacks and bribes to prenatal care clinic operator  Clinica.  In return, Clinica sent patients to Tenet facilities for medical services related to labor and delivery that were paid for by  the Medicaid and Medicare programs.  Most of these patients were  undocumented pregnant Hispanic  women.

51.     More  specifically,  these  Tenet  hospitals  embarked  upon  a  scheme  to artificially  inflate the Company's Medicaid and Medicare revenues by defrauding the United States.  According to the  investigation by the DOJ, certain executives at  the Georgia and South Carolina Tenet hospitals knew that "the owners and operators of Clinica were very successful at attracting pregnant, undocumented Hispanic women to its clinics for  prenatal care and were able to control where these women delivered their babies." The Tenet executives also knew, according to the DOJ, that Tenet "could potentially realize a significant revenue stream from Medicaid and Medicare [disproportionate share] payments for providing labor and delivery  services to the Clinica patients and for providing services to their newborn babies."

52.     To induce Clinica to steer its patients to Tenet hospitals, the executives at the Tenet hospitals and the owners and operators of Clinica caused Tenet and Clinica to enter into various contracts.   Under the contracts, Tenet "purported to pay Clinica to provide various

---

[2] The entire CIA is incorporated by reference into this Complaint and can be found at: https://oig.hhs.gov/fraud/cia/agreements/tenetciafinal.pdf.

services to the Tenet Hospitals including management services, marketing consulting services, translation services, translation management services, Medicaid eligibility determination paperwork, community outreach, educational classes, and birth certificate services." But, as the DOJ found, "the contracts were a pretextual mechanism" that allowed Tenet executives "to induce the owners and operators of Clinica to refer the Clinica patients to the Tenet Hospitals and arrange for services to be provided to the Clinica patients and their newborns at the Tenet Hospital."

53. In total, Tenet unlawfully obtained more than $125 million in Georgia and South Carolina Medicaid funds and more than $20 million in Medicare funds for services provided to Clinica patients and their newborns at Tenet hospitals as a result of the patient referral kickback scheme. The scheme, however, endangered the lives of patients, as many of the women travelled long distances to Tenet hospitals for medical services that could have been provided more safely near their homes.

54. Over the life of the kickback scheme, Tenet paid more than $12 million in patient referral fees to Clinica. In particular, as detailed by the DOJ, Tenet's hospitals paid the following amounts to Clinica or a Clinica affiliate:

| Year | Atlanta Medical Hospital | North Fulton Hospital | Hilton Head Hospital |
|---|---|---|---|
| 2000 | $423,125 | - | - |
| 2001 | $527,346 | $103,480 | - |
| 2002 | $658,335 | $562,260 | - |
| 2003 | $785,835 | $463,840 | - |
| 2004 | $761,610 | $462,014 | - |
| 2005 | $674,910 | $424,537 | - |
| 2006 | $579,498 | $428,420 | - |
| 2007 | $476,378 | $435,622 | $121,000 |
| 2008 | $515,402 | $441,938 | $176,000 |
| 2009 | $502,553 | $452,304 | $199,000 |
| 2010 | $495,215 | $416,710 | $208,000 |
| 2011 | $388,659 | $318,879 | - |
| 2012 | $143,276 | $225,294 | - |
| 2013 | - | $158,743 | - |

## THE IMPROPER STATEMENTS

55.     The Company's stockholders were unaware of this illegal scheme occurring at Tenet due to the Individual Defendants' improper public statements.  The Individual Defendants signed the Company's Annual Reports on Forms 10-K filed with the SEC, which attested to Tenet's functioning internal controls, in addition to containing its financial results.  These reports, however, failed to disclose the material information concerning the source of millions of dollars' worth of the Company's revenue, the illegal referral/kickback scheme detailed herein.  Further, Tenet did not have effective internal controls for compliance with the Anti-Kickback Statute, the False Claims Act, or federal securities laws.

56.     In particular, on February 28, 2012, Tenet filed its 2011 Annual Report on Form 10-K for the year ended December 31, 2011, with the SEC (the "2011 Form 10-K").  The 2011 Form 10-K was signed by defendants Fetter, Cancelmi, Porter, Bush, Gaines, Garrison, Kangas, Kerrey, Pettingill, Rittenmeyer, and Unruh.  In the 2011 Form 10-K, these defendants represented that Tenet's financial results for the period were fairly and accurately presented, including Medicaid-related patient revenues, stating:

> Medicaid-related patient revenues recognized by our continuing general hospitals from Medicaid-related programs in the states in which they are located, as well as from Medicaid programs in neighboring states, for the years ended December 31, 2011, 2010 and 2009 are set forth in the table below:

| | Years Ended December 31, | | | | | |
| | 2011 | | 2010 | | 2009 | |
| | Medicaid | Managed Medicaid | Medicaid | Managed Medicaid | Medicaid | Managed Medicaid |
|---|---|---|---|---|---|---|
| California | $ 221 | $ 127 | $ 137 | $ 111 | $ 125 | $ 99 |
| Florida | 184 | 60 | 194 | 55 | 182 | 56 |
| Pennsylvania | 91 | 195 | 53 | 161 | 53 | 157 |
| Georgia | 88 | 40 | 87 | 40 | 73 | 41 |
| Texas | 64 | 114 | 66 | 109 | 67 | 107 |
| Missouri | 52 | 5 | 81 | 6 | 75 | 6 |
| South Carolina | 40 | 22 | 61 | 20 | 52 | 17 |
| Alabama | 30 | — | 26 | — | 14 | — |
| North Carolina | 23 | — | 26 | — | 27 | — |
| Nebraska | 22 | 7 | 24 | 6 | 23 | 6 |
| Tennessee | 10 | 30 | 9 | 27 | 9 | 30 |
| | $ 825 | $ 600 | $ 764 | $ 535 | $ 700 | $ 519 |

57.     The 2011 Form 10-K also represented that the Company's controls and procedures were effective, stating:

> We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as defined by Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. The evaluation was performed under the supervision and with the participation of management, including our chief executive officer and chief financial officer. Based upon that evaluation, the chief executive officer and chief financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective in accumulating and communicating, in a timely manner, the material information related to the Company (including its consolidated subsidiaries) required to be included in our periodic Securities and Exchange Commission filings.

> Management's report on internal control over financial reporting is set forth on page 80 and is incorporated herein by reference. The independent registered public accounting firm that audited the financial statements included in this report has issued an attestation report on our internal control over financial reporting as set forth on page 81 herein.

> During the fourth quarter of 2011, there were no changes to our internal control over financial reporting, or in other factors, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

58.     On February 26, 2013, Tenet filed its 2012 Annual Report on Form 10-K for the year ended December 31, 2012, with the SEC (the "2012 Form 10-K"). The 2012 Form 10-K was

signed by defendants Ramsey, Fetter, Cancelmi, Bush, Gaines, Garrison, Kangas, Kerrey, Pettingill, Rittenmeyer, and Unruh.  For the quarter, Tenet reported net income of $49 million, or $0.45 per diluted share, on revenue of $2.33 billion, compared to a net loss of $76 million, or $0.70 per diluted share, on revenue of $2.17 billion for the same period in the prior year. For 2012, Tenet reported net income of $141 million, or $1.30 per diluted share, on revenue of $9.12 billion, compared to net income of $58 million, or $0.48 per diluted share, on revenue of $8.65 billion for 2011.  Again, these defendants represented that Tenet's  financial results for the period were fairly and accurately presented, including Tenet's Medicaid-related patient revenues.  The 2012 Form 10-K stated:

> Medicaid-related patient revenues recognized by our continuing general hospitals from Medicaid-related programs in the states in which they are located, as well as from Medicaid programs in neighboring states, for the years ended December 31, 2012, 2011 and 2010 are set forth in the table below:

| Hospital Location | Years Ended December 31, | | | | | |
| | 2012 | | 2011 | | 2010 | |
| | Medicaid | Managed Medicaid | Medicaid | Managed Medicaid | Medicaid | Managed Medicaid |
|---|---|---|---|---|---|---|
| California | $    198 | $    148 | $    221 | $    127 | $    137 | $    111 |
| Florida | 178 | 61 | 184 | 60 | 194 | 55 |
| Georgia | 85 | 38 | 88 | 40 | 87 | 40 |
| Pennsylvania | 72 | 209 | 91 | 195 | 53 | 161 |
| Missouri | 70 | 5 | 52 | 5 | 81 | 6 |
| Texas | 67 | 123 | 64 | 114 | 66 | 109 |
| North Carolina | 40 | — | 23 | — | 26 | — |
| South Carolina | 34 | 25 | 40 | 22 | 61 | 20 |
| Alabama | 31 | — | 29 | — | 26 | — |
| Tennessee | 8 | 29 | 10 | 30 | 9 | 27 |
| | $    783 | $    638 | $    802 | $    593 | $    740 | $    529 |

59.     The 2012 Form 10-K also represented that the Company's controls and procedures were effective, stating:

> We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as defined by Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. The evaluation was performed under the supervision and with the participation of management, including our chief executive officer and chief financial officer.

Based upon that evaluation, the chief executive officer and chief financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective in accumulating and communicating, in a timely manner, the material information related to the Company (including its consolidated subsidiaries) required to be included in our periodic Securities and Exchange Commission filings.

Management's report on internal control over financial reporting is set forth on page 80 and is incorporated herein by reference. The independent registered public accounting firm that audited the financial statements included in this report has issued an attestation report on our internal control over financial reporting as set forth on page 81 herein.

During the fourth quarter of 2012, there were no changes to our internal control over financial reporting, or in other factors, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

60.     On April 30, 2013, Tenet issued a press release and filed its Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2013.   For the quarter, Tenet reported a net loss of $88 million, or $0.85 per diluted share, on revenue of $2.39 billion, compared to net income of $58 million, or $0.53 per diluted share, on revenue of $2.30 billion for the same period in the prior year.

61.     On or around July 23, 2013, Tenet attempted to defend its relationship with Clinica in a released statement.  In particular, Tenet stated "we believe the agreements between Hispanic Medical Management (HMM) and Atlanta Medical Center, North Fulton Medical Center, Spalding Regional Medical Center and Hilton Head Hospital, were appropriate and provided substantial benefit to women in underserved Hispanic communities served by those hospitals….   These services are important to addressing the healthcare gaps that affect many Hispanic patients and other minority communities."

62.     On August 6, 2013, Tenet issued a press release and filed its Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results

for the quarter ended June 30, 2013.  For the quarter, Tenet reported a net loss of $50 million, or $0.49 per diluted share, on revenue of $2.42 billion, compared to a net loss of $6 million, or $0.06 per diluted share, on revenue of $2.27 billion for the same period in the prior year.

63.     On November 4, 2013, Tenet issued a press release and filed its Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2013.  For the quarter, Tenet reported net income of $28 million, or $0.27 per diluted share, on revenue of $2.41 billion, compared to net income of $40 million, or $0.37 per diluted share, on revenue of $2.22 billion for the same period in the prior year.

64.     On February 24, 2014, Tenet filed its 2013 Annual Report on Form 10-K for the year ended December 31, 2013, with the SEC (the "2013 Form 10-K").  In the 2013 Form 10-K, signed by defendants Ramsey, Fetter, Cancelmi, Bush, Gaines, Garrison, Kangas, Kerrey, Pettingill, Rittenmeyer, and Unruh, Tenet represented that Tenet's financial results for the period were fairly and accurately presented.  For the quarter, Tenet reported a net loss of $24 million, or $0.24 per diluted share, on revenue of $3.89 billion, compared to net income of $49 million, or $0.45 per diluted share, on revenue of $2.33 billion for the same period in the prior year.  For 2013, Tenet reported a net loss of $134 million, or $1.32 per diluted share, on revenue of $11.10 billion, compared to net income of $152 million, or $1.30 per diluted share, on revenue of $9.12 billion for 2012.  Specifically, as to Tenet's Medicaid-related patient revenues for the fiscal year, the 2013 Form 10-K stated:

> Medicaid-related patient revenues recognized by our continuing general hospitals from Medicaid-related programs in the states in which they are located, as well as from Medicaid programs in neighboring states, for the years ended December 31, 2013, 2012 and 2011 are set forth in the table below:

| Hospital Location | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | | 2012 | | 2011 | |
| | Medicaid | Managed Medicaid | Medicaid | Managed Medicaid | Medicaid | Managed Medicaid |
| California | $ 242 | $ 164 | $ 198 | $ 148 | $ 221 | $ 127 |
| Florida | 178 | 65 | 178 | 61 | 184 | 60 |
| Texas | 151 | 151 | 67 | 123 | 64 | 114 |
| Georgia | 77 | 35 | 85 | 38 | 88 | 40 |
| Pennsylvania | 74 | 200 | 72 | 209 | 91 | 195 |
| Michigan | 64 | 96 | — | — | — | — |
| Missouri | 64 | 6 | 70 | 5 | 52 | 5 |
| North Carolina | 34 | 5 | 40 | — | 23 | — |
| Illinois | 33 | 6 | — | — | — | — |
| South Carolina | 22 | 25 | 34 | 25 | 40 | 22 |
| Alabama | 13 | — | 31 | — | 29 | — |
| Arizona | 9 | 21 | — | — | — | — |
| Massachusetts | 9 | 8 | — | — | — | — |
| Tennessee | 6 | 27 | 8 | 29 | 10 | 30 |
| | $ 976 | $ 809 | $ 783 | $ 638 | $ 802 | $ 593 |

65.     The 2013 Form 10-K also represented that the Company's controls and procedures were effective, stating:

> We completed our acquisition of Vanguard effective October 1, 2013. The facilities acquired as part of the Vanguard acquisition utilize different information technology systems than our other facilities. We have excluded all of the Vanguard operations from our assessment of and conclusion on the effectiveness of our internal control over financial reporting. The rules of the Securities and Exchange Commission ("SEC") require us to include acquired entities in our assessment of the effectiveness of internal control over financial reporting no later than the annual management report following the first anniversary of the acquisition. We will complete the evaluation and integration of the Vanguard operations within the required timeframe and report management's assessment of our internal control over financial reporting, including the acquired hospitals and other operations, in our first annual report in which such assessment is required. Other than the Vanguard acquisition, there were no changes in our internal control over financial reporting during the quarter ended December 31, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.
>
> We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as defined by Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this report with respect to our operations that existed prior to the Vanguard acquisition. The evaluation was performed under the supervision and with the participation of management, including our chief executive officer and chief financial officer. Based upon that

- 27 -

evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are effective to ensure that material information is recorded, processed, summarized and reported by management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the SEC rules thereunder.

Management's report on internal control over financial reporting is set forth on page 88 and is incorporated herein by reference. The independent registered public accounting firm that audited the financial statements included in this report has issued an attestation report on our internal control over financial reporting as set forth on page 89 herein.

66.     On May 5, 2014, Tenet issued a press release and filed its Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2014.  For the quarter, Tenet reported a net loss of $32 million, or $0.33 per diluted share, on revenue of $3.93 billion, compared to a net loss of $88 million, or $0.85 per diluted share, on revenue of $2.39 billion for the same period in the prior year.

67.     On August 4, 2014, Tenet issued a press release and filed its Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2014.  For the quarter, Tenet reported a net loss of $26 million, or $0.27 per diluted share, on revenue of $4.04 billion, compared to a net loss of $50 million, or $0.49 per diluted share, on revenue of $2.42 billion for the same period in the prior year.

68.     On November 3, 2014, Tenet issued a press release and filed its Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 30, 2014.  For the quarter, Tenet reported net income of $9 million, or $0.09 per diluted share, on revenue of $4.18 billion, compared to net income of $28 million, or $0.27 per diluted share, on revenue of $2.41 billion for the same period in the prior year.

69.     On February 23, 2015, Tenet filed its Annual Report on Form 10-K for the year ended December 31, 2014, with the SEC (the "2014 Form 10-K").  In the 2014 Form 10-K,

which was signed by defendants Ramsey, Fetter, Cancelmi, Gaines, Garrison, Kangas, Kerrey, Lewis-Hall, Pettingill, Rittenmeyer, and Unruh, for the quarter, Tenet reported net income of $61 million, or $0.61 per diluted share, on revenue of $4.47 billion, compared to a net loss of $24 million, or $0.24 per diluted share, on revenue of $3.89 billion for the same period in the prior year. For 2014, Tenet reported a net income of $12 million, or $0.12 per diluted share, on revenue of $16.62 billion, compared to a net loss of $134 million, or $1.32 per diluted share, on revenue of $11.10 billion for 2013.  Specifically, as to Tenet's Medicaid-related patient revenues for the fiscal year, the 2014 Form 10-K stated:

> Medicaid-related patient revenues recognized by our continuing general hospitals from Medic-aid related programs in the states in which they are located as well as from Medicaid programs in neighboring states, for the years ended December 31, 2014, 2013, and 2012 are set forth in the table below:

| | Year Ended December 31, | | | | | |
| | 2014(1) | | 2013 | | 2012 | |
| Hospital Location | Medicaid | Managed Medicaid | Medicaid | Managed Medicaid | Medicaid | Managed Medicaid |
|---|---|---|---|---|---|---|
| Michigan | $   337 | $   269 | $   64 | $   96 | $   — | $   — |
| California | 311 | 261 | 242 | 164 | 198 | 148 |
| Texas | 281 | 229 | 151 | 151 | 67 | 123 |
| Florida | 160 | 111 | 178 | 65 | 178 | 61 |
| Illinois | 80 | 31 | 33 | 6 | — | — |
| Georgia | 73 | 37 | 77 | 35 | 85 | 38 |
| Pennsylvania | 73 | 194 | 74 | 200 | 72 | 209 |
| Missouri | 67 | 9 | 64 | 6 | 70 | 5 |
| Massachusetts | 39 | 46 | 9 | 8 | — | — |
| North Carolina | 29 | 8 | 34 | 5 | 40 | — |
| South Carolina | 15 | 31 | 22 | 25 | 34 | 25 |
| Alabama | 12 | — | 13 | — | 31 | — |
| Tennessee | 7 | 29 | 5 | 27 | 8 | 29 |
| Arizona | 1 | 115 | 9 | 21 | — | — |
| | $   1,485 | $   1,370 | $   975 | $   809 | $   783 | $   638 |

(1)Includes revenues related to the 28 hospitals we acquired from Vanguard on October 1, 2013, as well as TRMC, Resolute Health Hospital and Emanuel Medical Center.

70.    The 2014 Form 10-K also represented that the Company's controls and procedures were effective, stating:

> We carried out an evaluation of the effectiveness of our disclosure controls and procedures as defined by Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report.  The evaluation was performed under the supervision and with the

participation of management, including our chief executive officer and chief financial officer. Based upon that evaluation, the chief executive officer and chief financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective in ensuring that information required to be disclosed in our Securities Exchange Act reports is recorded, processed, summarized and reported in a timely manner and that such information is accumulated and communicated to management, including our chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

71. On May 4, 2015, post-market, Tenet issued a press release and filed its Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2015. For the quarter, Tenet reported net income of $47 million, or $0.47 per diluted share, on revenue of $4.43 billion, compared to a net loss of $32 million, or $0.33 per diluted share, on revenue of $3.93 billion for the same period in the prior year.

## **THE TRUTH EMERGES**

72. Also, on May 4, 2015, Tenet filed its Quarterly Report on Form 10-Q with the SEC. In this report, Tenet disclosed that on April 10, 2015 the "DOJ informed us that our four hospital subsidiaries that are defendants in the qui tam action have also been designated as targets of the government's criminal investigation." On this news, Tenet's market capitalization fell approximately $250 million, or 5%.

73. Tenet continued to leak out the news about the seriousness of the illegal kickback/referral scheme. On August 3, 2015, Tenet disclosed in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2015, filed with the SEC that "***On May 6, 2015, we received a grand jury subpoena pursuant to which the DOJ informed us that it is seeking additional documents pertaining to the four hospitals, as well as other hospitals in our***

*Southern region. These are hospitals that might have had interactions during the period from January 2000 through May 2015 with certain individuals who are targets of the pending criminal investigation.*"   While Tenet claims that it would "vigorously defend against the government's allegations," it revealed that it would reserve approximately $20 million to reflect the lower end of the range of probable liability.   As was ultimately shown, this amount was well below the eventual penalty.

74.     On February 22, 2016, Tenet filed its Annual Report on Form 10-K for the year ended December 31, 2015, with the SEC.   In the Form 10-K, Tenet revealed that it made an offer to settle the government investigations into its illegal kickback/referral practices for $238 million, more than ten times the amount it previously announced it reserved for litigation.

75.     On May 2, 2016, Tenet announced that it increased its offer to settle from $238 million to $407 million in its Quarterly Report on Form 10-Q for the quarter ended March 31, 2016, filed with the SEC.

76.     Finally, on August 1, 2016, Tenet announced in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2016, filed with the SEC that it reached an agreement in principle to pay $513,788,345.   The payment is comprised of a civil monetary payment of $368 million and a criminal monetary payment of $145,788,345.   The Form 10-Q also revealed that: (i) THSM will enter into a non-prosecution agreement with the DOJ; (ii) the DOJ will appoint a corporate monitor that will serve for a period of three years to assess the Company's compliance with the Anti-Kickback Statute and Stark laws; and (iii) two of Tenet's indirect, wholly owned subsidiaries that previously operated the Atlanta Medical Center and North Fulton Hospital will agree to plead guilty under 18 U.S.C. §371 to a single count of conspiracy to violate the Anti-Kickback Statute and defraud the United States.   The Company also stated that it expected to

- 31 -

enter into a CIA with the Office of the Inspector General of HHS.

77.     Upon this news, the Company's market capitalization fell $133 million, or 4.64%.

78.     On October 3, 2016, Tenet issued its press release that announced the agreement with the DOJ was final.  The Company's market capitalization fell $115 million, or 5.12%.

79.     In the wake of the Company's massive $513 million settlement with the DOJ, the trading price of Tenet shares declined.  Tenet stockholders were stunned to learn, among other things, of the duration and magnitude of the unlawful patient referral kickback scheme, and that the Company's publicly reported consolidated financial results and financial statements included millions of dollars in unlawfully obtained Medicaid and Medicare revenues.  As a result of these alleged false and misleading statements, the Company has now been named as a primary defendant in a costly and expensive class action lawsuit for violations of the federal securities laws.

## DAMAGES TO TENET

80.     Tenet has been severely damaged and injured as a result of the unlawful patient referral kickback scheme.  As a direct and proximate result of the Individual Defendants' actions, Tenet has had to pay the government $513 million to  due to its violation of the federal False Claims Act and the Anti-Kickback Statute.  Additionally, the Company was forced to accept an extensive and costly non-prosecution agreement and to retain an independent corporate monitor.

81.     In addition, Tenet is now facing multiple securities class actions over the defendants' improper statements.  The class actions challenge Tenet's statements going back five years due to the applicable statute of limitations, but the improper statements began well before that, when the illegal scheme detailed herein began.  It is only due to sheer luck concerning the

length of the statute of limitation, or defendants' ability to keep the illegal scheme hidden for so long, that Tenet's exposure is not greater.

82.    Further, Tenet's continued violations of healthcare law damaged its reputation within the business community and in the capital markets.  The Company's current and potential investors consider a company's trustworthiness, stability, ability to accurately value its business prospects, and ability to keep costs reasonable and fair.  Businesses are less likely to do business with companies that violate federal law, disseminate improper statements to their investors, fail to comply with their own internal protocols and external regulations, and are uncertain about their own financial conditions.  Tenet's ability to raise equity capital or debt on favorable terms in the future is now impaired.

83.    Finally, Tenet has damaged its credibility with the federal government, a customer it depends on for its survival.  The government is likely to scrutinize closer its dealings with Tenet going forward due the actions challenged herein.

## DERIVATIVE ALLEGATIONS

84.    Plaintiff brings this action derivatively in the right and for the benefit of Tenet to redress injuries suffered, and to be suffered, by Tenet as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Tenet is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

85.    Plaintiff will adequately and fairly represent the interests of Tenet in enforcing and prosecuting its rights.

86.    Plaintiff was a stockholder of Tenet at the time of the wrongdoing complained of,

has continuously been a stockholder since 2010, and is a current Tenet stockholder.

87.   The current Board of Tenet consists of the following fourteen individuals: defendants Fetter, Gaines, Garrison, Kangas, Kerrey, Lewis-Hall, Pettingill, Romo, Rittenmeyer, and Unruh, and non-defendants John P. Byrnes, Matthew J. Ripperger, Randolph C. Simpson, and Peter M. Wilver.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

88.   Defendants Fetter, Gaines, Garrison, Kangas, Kerrey, Lewis-Hall, Pettingill, Rittenmeyer, Romo, and Unruh all made improper statements in the Company's public statements, including its SEC filings, concerning the source of Tenet's revenue and internal controls.  Because defendants Fetter, Gaines, Garrison, Kangas, Kerrey, Lewis-Hall, Pettingill, Rittenmeyer, Romo, and Unruh face a substantial likelihood of liability for making the improper statements, demand upon them is futile.

89.   Defendants Pettingill, Gaines, Garrison, Kangas, Kerrey, and Lewis-Hall served on the Quality, Compliance and Ethics Committee during the time of the illegal kickback/referral scheme detailed herein.  Pursuant to the CIA and the committee's Charter, these defendants were directly responsible to the Company's internal controls concerning compliance with federal law. They had a duty to review, understand, and fix any compliance issues.  Given the magnitude and duration of the illegal kickback/referral scheme, defendants Pettingill, Gaines, Garrison, Kangas, Kerrey, and Lewis-Hall could not have been fulfilling their fiduciary duties.  Accordingly, demand upon them is futile.

90.   Defendants Fetter, Gaines, Garrison, Kangas, Kerrey, Lewis-Hall, Pettingill, Rittenmeyer, Romo, and Unruh ignored numerous red flags concerning the Company's compliance issues and allowed Tenet's inadequate controls to continue.  Among other things, the

Company has a long history of improper billing practices that violate federal law.  Further, even after the whistleblower filed its *qui tam* action, the illegal kickback/referral conspiracy continued. These illegal actions and inadequate controls continued at Tenet despite these defendants knowing that noncompliance with the Anti-Kickback Statute and the False Claims Act ran the risk of the Company losing its access to Medicaid and Medicare, which are essential to Tenet's continued survival.

91.     Defendants Gaines, Garrison, Kerrey, Rittenmeyer, Romo, and Unruh were members of the Audit Committee at the time of the improper statements detailed herein. Pursuant to the committee's Charter, the members of the Audit Committee were and are responsible for reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls.   Defendants Gaines, Garrison, Kerrey, Rittenmeyer, Romo, and Unruh breached their fiduciary duties of loyalty because the Audit Committee allowed or permitted the Company to make the improper statements discussed above. Therefore, defendants Gaines, Rittenmeyer, Romo and Unruh each face a substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them is futile.

92.     Plaintiff has not made any demand on the other stockholders of Tenet to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Tenet is a publicly held company with over 99.6 million shares outstanding and thousands of stockholders;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur

excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     The Individual Defendants owed and owe Tenet fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Tenet the highest obligation of good faith, fair dealing, loyalty, and due care.

95.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

96.     The Individual Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company was engaged in an illegal kickback/referral scheme; (ii) the Company's internal controls were not working and inadequate; and (iii) they were making improper statements in the Company's filings.  Accordingly, the Individual Defendants breached their duty of care and loyalty to the Company.

97.     Defendants Pettingill, Gaines, Garrison, Kangas, Kerrey, Lewis-Hall, and Bush as members of the Quality, Compliance and Ethics Committee breached their fiduciary duty of loyalty by failing to adequately ensure the Company had adequate and working internal controls meant to ensure compliance with federal law and the CIA despite the red flags described herein.

98.     Defendants Gaines, Garrison, Kangas, Kerrey, Rittenmeyer, Romo, Unruh, and Williams as members of the Audit Committee breached their fiduciary duty of loyalty by

reviewing and approving the statements described herein.

99.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tenet has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

100.    Plaintiff, on behalf of Tenet, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    By their wrongful acts and omissions, the Individual Defendants wasted Tenet's valuable corporate assets by, among other things, causing the Company to pay improper compensation, bonuses and other benefits to certain Tenet executives who breached their fiduciary duties owed to Tenet and its stockholders.  Tenet received no benefit from these improper payments.  As a result, the Individual Defendants damaged Tenet and are liable to the Company for corporate waste.

103.    Plaintiff, on behalf of Tenet, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense and to the detriment of Tenet.

106.    All the payments and benefits provided to the Individual Defendants were at the

expense of Tenet.  The Company received no benefit from these payments.

107.    Plaintiff, on behalf of Tenet, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

108.    Plaintiff, on behalf of Tenet, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of the Company, demands judgment as follows:

A.      Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Tenet to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tenet and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines for Board supervision of Tenet's referral practices;

2.      a proposal to strengthen Tenet controls over financial reporting; and

3.      a proposal to require that the Company retain an independent expert to conduct an annual review of the Company's internal controls over both financial reporting and

compliance with federal law, who will report directly to the Board regarding the results of its annual review and any other related matters;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of the Company has an effective remedy;

D.      Awarding to Tenet restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: January 23, 2017
          THE LAW OFFICE OF BALON B. BRADLEY

          s/Balon B. Bradley

          _____

          BALON B. BRADLEY

          5473 Blair Road, Suite 100
          Dallas, TX 75231
          Telephone: (972) 991-1582
          Facsimile: (972) 755-0424
          E-mail: balon@bbradleylaw.com

          ROBBINS ARROYO LLP
          BRIAN J. ROBBINS
          KEVIN A. SEELY
          GINA STASSI
          LEONID KANDINOV
          600 B Street, Suite 1900
          San Diego, CA 92101

Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
      kseely@robbinsarroyo.com
      gstassi@robbinsarroyo.com
      lkandinov@robbinsarroyo.com

Attorneys for Plaintiff

1144789